UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JAMES JOYCE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 4:08-CV-1390 (CEJ) |
| ) | |
| ARMSTRONG TEASDALE, LLP, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the motion of defendant Armstrong Teasdale, LLP to dismiss the first amended complaint, pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiff James Joyce has filed a response in opposition to the motion, and the issues are fully briefed.

I. **Background**

Prior to 2000, plaintiff invented the Heuristic Firewall technology, which "was designed to provide greater security and privacy to guard the integrity of computers and computer networks than was then currently existing." (Doc. #39, at 2, para. 5). On February 22, 2000, plaintiff and his then-wife, Suzanne Magee Joyce (Magee), formed TechGuard Security, L.L.C., (TechGuard), "for the purpose of economically exploiting [p]laintiff's technology and providing other computer information and technology services to individuals, businesses and governmental agencies." (Doc. #39, at 2, para. 6). Defendant, a law firm, drafted several of the documents that established TechGuard. Id.

Plaintiff served as TechGuard's Co-Chief Executive Officer and the Chief Technology Officer, while Magee served as Co-Chief Executive Officer and President. (Doc. #39, at 3, para. 10). Initially, ownership was apportioned so that TechGuard could be certified as a minority-owned business and a small disadvantaged business.

Thus, Magee owned 4.9 million units, plaintiff owned 3.9 million units, Andrea Johnson owned 1 million units, and Jeffrey Johnson owned 300,000 units. After the Small Business Administration (SBA) rejected TechGuard's application for certification, plaintiff transferred 700,000 units of his ownership to Andrea Johnson, who also received Jeffrey Johnson's entire ownership interest. The SBA then certified TechGuard as a minority-owned business.

After the incorporation of TechGuard, defendant assisted plaintiff in the preparation of a U.S. patent application covering his Heuristic Firewall technology. The declaration and power of attorney for the patent application listed "[p]laintiff as the sole [and] first inventor and appointed [several attorneys from] Defendant Armstrong Teasdale, as his attorneys and/or agents with the authority to prosecute his patent application." (Doc. #39, at 4, para. 16). On February 11, 2003, the United States Patent and Trademark Office issued plaintiff a "patent for the methods and apparatus for [the] Heuristic Firewall." Id. at 5.

After May 2000, plaintiff and TechGuard executed a Transfer Agreement dated February 22, 2000. Section 1(a) of the Transfer Agreement states that plaintiff is the owner of the Heuristic Firewall technology. Pursuant to this section, plaintiff also "grant[s TechGuard] an exclusive, royalty-free license to the [Heuristic Firewall technology] pursuant to the terms and conditions set forth in such license agreement."[1] (Doc. #39-4).

Later in 2000, plaintiff and TechGuard signed a Confidentiality and Invention Rights Agreement (the Rights Agreement) dated February 22, 2000. (Doc. #39-2).

---

[1]Under the Transfer Agreement, "[p]laintiff remains a 7% equity holder in TechGuard and consequently still has rights in revenues it generates from the subject inventions (and any other revenues it generates for that matter)." (Doc. #31, at 6 n.4).

Pursuant to section 5.A of the Rights Agreement, plaintiff "[a]greed to assign . . . to [TechGuard] all right, title[,] and interest in and to all Inventions and Proprietary Information and intellectual property, including patents (U.S. and foreign) covering said Inventions and Proprietary Information, which shall be and remain the sole and exclusive property of [TechGuard.]"  (Doc. #39-2, at 2).  Additionally, the parties agreed that the Rights Agreement "shall not apply to inventions or discoveries made or conceived of and set forth in a tangible medium of expression by [plaintiff] prior to [the] Agreement."  Id.  As such, plaintiff "agree[d] not to assert that any discoveries were made or conceived prior to the date of [the] Agreement except" for the Heuristic Firewall technology.  (Doc. #39-2, at 2, 5).  Pursuant to section 17, plaintiff "represent[ed] and warrant[ed] that he (a) . . . had an opportunity to review [the] Agreement and ask an authorized representative of [TechGuard] questions about the Agreement, and (b) [understood] the meaning and effect of each Section of [the] Agreement."  (Doc. #39-2, at 4).

On January 1, 2001, plaintiff and TechGuard executed a Patent License Agreement (the License Agreement).  (Doc. #39-3).  Pursuant to section 2 of the License Agreement, plaintiff "grant[ed] to [TechGuard] a perpetual, exclusive license under the Patents and Technical Information to make, have made, use, offer to sell, import, and sell Licensed Products in the Territory."  (Doc. #39-3, at 1).  The License Agreement also states that:

> 2.2 The exclusive rights and license granted in this License shall include all inventions related to the Licensed Products which Licensor owns or controls as of the date of this License and all patent applications and patents based on or covering such inventions which Licensor now owns or controls, or hereafter owns or controls.
>
> 3. <u>Term</u>.  This License and the licenses granted hereunder shall continue in perpetuity, unless terminated pursuant to Section 8.

(Doc. #39-3, at 1).

Subsequently, TechGuard received a grant from the National Institute of Standards and Technology to further develop the Heuristic Firewall technology. (Doc. #39, at 6, para. 21).

In 2003, TechGuard received an appraisal report dated October 29, 2003, indicating that the Heuristic Firewall technology had a "licensing royalty value . . . in the high hundreds of millions and the enterprise value exceeded several billion dollars." (Doc. #39, at 8-9, para. 30).

In February 2006, defendant filed a provisional patent application for plaintiff based on the improvements of the Heuristic Firewall technology, and, in August 2006, plaintiff filed an actual patent application for the expansion of the technology. Likewise, in November 2006, defendant filed a patent application for the developments of the Heuristic Firewall technology on behalf of TechGuard. (Doc. #39, at 6-7, para. 24).

In 2006, plaintiff left the employ of TechGuard and in 2007, he was divorced from Magee. Pursuant to the divorce decree, Magee received fifty percent (50%) of the Heuristic Firewall technology patent. (Doc. #39, at 8, para. 29). On September 12, 2008, brought the instant action, claiming breach of fiduciary duty and negligence. Plaintiff asserts jurisdiction based on diversity of citizenship.

II.     <u>Legal Standard</u>

The purpose of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is to test the legal sufficiency of the complaint. The factual allegations of a complaint are assumed true and construed in favor of the plaintiff, "even if it

strikes a savvy judge that actual proof of those facts is improbable." Bell Atlantic Corp. v. Twombly, --- U.S. ---, 127 S. Ct. 1955, 1965 (May 21, 2007) citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"). The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of his claim. Id. A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp., 127 S. Ct. at 1974. See also id. at 1969 ("no set of facts" language in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), "has earned its retirement."). "Factual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965.

### III. Discussion

In Count I, plaintiff claims that defendant breached its fiduciary duty of loyalty by (1) advising plaintiff to sign the Rights, Transfer, and License Agreements that benefitted TechGuard and damaged him; (2) failing to advise plaintiff to retain separate counsel before signing the agreements; (3) failing to obtain a conflict of interest waiver from plaintiff; and (4) omitting plaintiff's name from the November 2006 patent application. In Count II, plaintiff claims that defendant committed professional negligence by simultaneously providing legal services to plaintiff and TechGuard, which created a conflict of interest. Defendant contends that plaintiff's claims are time-barred and urges the Court to dismiss the first amended complaint.

"A federal district court sitting in diversity is required to apply the law of the state in which it is located when ruling on matters of limitations." Rademeyer v. Farris,

284 F.3d 833, 836 (8th Cir. 2002) (citing Nettles v. Am. Tel. & Tel. Co., 55 F.3d 1358, 1362 (8th Cir. 1995)).  "Missouri, the forum, considers statutes of limitations issues procedural, and, therefore, governed by Missouri law." Nettles, 55 F.3d at 1362 (citing Renfroe v. Eli Lilly & Co., 686 F.2d 642, 646 (8th Cir. 1982)).

Under Missouri law, "[a]ctions for legal malpractice based on negligence [or breach of fiduciary duty] are governed by the five-year statute of limitations in [Mo.Rev.Stat.] § 516.120(4)."[2] Klemme v. Best, 941 S.W.2d 493, 497 (Mo. 1997) (en banc) (citing Lehnig v. Bornhop, 859 S.W.2d 271, 273 (Mo. Ct. App. 1993); Koester v. Am. Republic Investments, Inc.,11 F.3d 818, 821 (8th Cir. 1993)).  "Section 516.120(4)'s limitation begins to run when damage is sustained and objectively capable of ascertainment." Klemme, 941 S.W.2d at 497 (citations omitted).

In the instant action, there is no dispute that plaintiff's damages -- his loss of licensing royalties and revenues from his inventions -- resulted from defendant's alleged legal malpractice.  Rather, the parties disagree as to when plaintiff was capable of ascertaining such damage.  Defendant contends that plaintiff became aware of his damages when he signed the three agreements.  Thus, defendant maintains that plaintiff was capable of ascertaining his damages, at the latest, in 2001 when plaintiff and TechGuard executed the License Agreement.  Plaintiff, however, argues that he was not capable of ascertaining his damages until either (1) it was determined that the Heuristic Firewall patent was commercially viable in 2005, or (2) when he left the employ of TechGuard and obtained a new attorney in 2006.

---

[2]"Within five years[, a]n action for taking, detaining or injuring any goods or chattels, including actions for the recovery of specific property, or for any other injury to the person or rights of another, not arising on contract and not herein otherwise enumerated[.]" Mo.Rev.Stat. § 516.120(4).

To support their contentions, the parties rely on Dixon v. Shafton, 649 S.W.2d 435 (Mo. 1983) (en banc), Zero Mfg. Co. v. Husch, 743 S.W.2d 439 (Mo. Ct. App. 1987), and Klemme, 941 S.W.2d 493.

In Dixon, four partners signed a contract without being advised by their fifth partner, an attorney, that the contract contained a clause that later caused them to sustain damages. 649 S.W.2d at 437. After the fifth partner discovered the damaging clause, he disclosed this information to the partners and encouraged them to retain separate counsel. Id. The four partners then filed a legal malpractice action against the fifth partner. Id. The Missouri Supreme Court held that the statute of limitations for the plaintiffs' action did not begin to run until the attorney-partner advised them to retain counsel. Id. at 438.

The Missouri Supreme Court employed a similar approach in Zero Mfg., 743 743 S.W.2d 439. In Zero Mfg., the plaintiff and the company, Svanoe, entered into a contract that the defendants, the plaintiff's attorneys, drafted. Id. at 440. The defendants advised the plaintiff that it could terminate the contract by giving thirty days notice. Id. Relying on the defendants' advice, the plaintiff provided thirty days notice to Svanoe, who, in turn, informed the plaintiff that the Wisconsin ninety-day notice requirement governed the contract. Id. The defendants reiterated to the plaintiff that thirty days notice was sufficient. Id. Four years later, Svanoe obtained a judgment against the plaintiff for violating the Wisconsin notice requirement. Id. Three years after the judgment, the plaintiff filed a legal malpractice action against the defendants. The court held that the plaintiff was capable of ascertaining its damages when the defendants "allegedly reaffirmed their advice that the plaintiff could terminate the contract by giving Svanoe thirty days notice." 743 S.W.2d at 441. As

such, the court found that the statute of limitations for the plaintiff's legal malpractice action began to accrue on that date.

In Klemme, the defendant represented several police officers, including the plaintiff, who were named in a civil rights action. 941 S.W.2d 493, 495. Although the plaintiff had not participated in the underlying activity, the defendant failed to inform the opposing counsel of this fact. Id. Without filing a motion to dismiss the action as to the plaintiff, the defendant engaged in settlement negotiations on behalf of all the police officers. Id. at 497. "After learning of the imminent settlement, [the plaintiff] retained separate counsel[,] demanded his outright dismissal[,]" and filed a legal malpractice action against the defendant. Id. The Missouri Supreme Court noted that the plaintiff "was under no duty to double check [his attorney's] work[.] However, by the time [the plaintiff] retained separate counsel in February 1987, the fact of damage could have been discovered or made known." Id. (internal citations omitted).

The Missouri Supreme Court, in a recent opinion, addressed the interpretation of the "capable of ascertainment" language. In Powel v. Chaminade Coll. Preparatory, Inc., the court wrote:

> [T]he [Missouri] legislature specifically require[s] in section 516.100[3] that a court cannot make the time the wrong is done or the technical breach

---

[3]Missouri Revised Statute § 516.100 provides:

> Civil actions, other than those for recovery of real property, can only be commenced within the periods prescribed in the following sections, after the causes of action shall have accrued; provided, that for the purposes of sections 516.100 to 516.370, <u>the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment</u>, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained.

MO.REV.STAT. § 516.100 (emphasis added).

>of duty occurs the time when the cause of action accrues. Neither does it accrue as soon as damages occur. A third event must also take place before the claim accrues: in addition to a wrongful act, and in addition to the resulting damages, the damages must also be <u>capable of ascertainment</u>.

197 S.W.3d 576, 582 (Mo. 2006) (en banc) (emphasis in original) (citing MO.REV.STAT. § 516.100). Because the Missouri Supreme Court "[had] not previously clearly articulated a specific, generally applicable test to be used in making this determination," the Powel court explained that "the statute of limitations begins to run when the 'evidence [is] such to place a reasonable prudent person on notice of a potentially actionable injury.'" 197 S.W.3d 576, 582 (emphasis omitted).

After examining plaintiff's first amended complaint and the applicable Missouri case law, the Court believes that plaintiff's damages were capable of ascertainment when he signed the agreements in 2000 and 2001. When plaintiff signed the Transfer Agreement dated February 22, 2000, he specifically granted TechGuard a royalty-free license. Additionally, pursuant to the Rights Agreement dated February 22, 2000, plaintiff assigned all of his then-existing patent rights to TechGuard. Finally, by signing the License Agreement dated January 1, 2001, plaintiff knowingly granted TechGuard a perpetual and exclusive license to his then-existing and future inventions. Based on the plain language of these agreements, it was obvious that, by signing these agreements, plaintiff relinquished all rights to any royalties or profits for his current patents and all of his future inventions. Because plaintiff's damages were ascertainable when he signed the last agreement in 2001, and plaintiff filed the instant action on September 12, 2008, more than seven years later, the Court finds that plaintiff's first amended complaint is untimely and barred by the five-year statute of limitations.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion to dismiss [Doc. #30] is **granted**.

**IT IS FURTHER ORDERED** that all other pending motions are **denied as moot**.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 8th day of February, 2010.