THE UNITED STATES DISTRICT COURT
THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JAMES JOYCE, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Civil Action No. 4:08 CV-01390-CEJ |
| ARMSTRONG TEASDALE, LLP, | ) ) ) |
| Defendant. | ) |

**REPLY MEMORANDUM IN SUPPORT OF
MOTION TO EXCLUDE EXPERT TESTIMONY OF STEPHEN WEEKS**

**I.    INTRODUCTION**

The parties agree that to be admissible, expert testimony must be provided by a person having the requisite qualifications, must be relevant (*i.e.*, useful and not misleading to the trier of fact) and must be reliable and trustworthy in an evidentiary sense.

Much of plaintiff's response is directed to arguments Armstrong does not make, and he responds only partially to arguments which Armstrong does make. Armstrong's motion seeks to exclude Weeks' report and testimony relating to the royalty value of the '703 patent. It does not seek to exclude Weeks' testimony "as to what terms [he says] are typically negotiated …." (Response at 5). Further, Armstrong's motion does not challenge Weeks' qualifications or the methodology he employed. The cases are clear, however, that there is much more to proper admissible expert testimony than qualifications and appropriate methodology.

What Armstrong does challenge is the $37 million valuation Weeks ascribes to the '703 patent given undisputed facts in this case and the unreliable, indeed speculative, assumptions

1742921.7

Weeks employed in applying his methodology. His royalty rate was not reliably based on comparable license agreements, and his revenue figures were derived from assumptions of market penetration and utilization pulled from thin air. Finally, Weeks' ultimate $37 million royalty value conclusion fails to fit the facts of this case, because it disregards Joyce's equity position in TechGuard and Magee's 50% ownership and rights in the patent.

Plaintiff suggests these are mere credibility matters for cross-examination. In short, he contends he should have an opportunity to mislead and confuse a jury with irrelevant, unreliable testimony based on the *ipse dixit* of an "expert." But that is not what the law allows. Qualifications and an accepted methodology are only part of what is required for admission of expert testimony. The other requirements are that the methodology be reliably applied based on reliably determined data and not merely the "say so" of the expert and that the opinions expressed reasonably relate to the facts at hand. Weeks fails in this regard.

In fact, no particular qualifications are required for what Weeks did. Based on published data of average royalty rates for unspecified software, not analysis of rates for comparable software, he picks a 10% royalty rate for the '703 patent. Then, he surmises anticipated revenues based upon admitted guesses of market penetration and market utilization. Multiplying these speculative market penetration and utilization figures by published data for total revenues in the software security market, he derives a revenue figure for the '703 patent (with a slight adjustment for a "ramp-up" period). Based on the product of this 10% royalty rate and posited revenues, discounted to present value, he derives his $37 million conclusion. The only thing he adds that could not be done by anyone else are his "professional qualifications."

Thus, in accordance with Rule 702, and as more specifically explained below, the Court should grant Armstrong's motion and exclude from trial any and all testimony from Weeks regarding the value of the '703 patent because it simply does not rise to the threshold level of reliable and relevant evidence.

## II. ARGUMENT

### A. Weeks' 10% Royalty Figure is So Fundamentally Unsupported that his Resultant Valuation Must be Excluded.

In its motion and supporting memorandum, Armstrong cited case law expressly dealing with patent valuation. These cases show that when a plaintiff seeks to establish damages for loss of patent rights through the relief from royalty approach -- the method Weeks uses -- he must support his hypothetical royalty rate with either (i) actual evidence of the "invention's footprint in the market place"[1] or (ii) royalty rates for patents "commensurate to the patent in suit."[2]

Because Weeks acknowledged the '703 patent lacks any footprint in the marketplace,[3] he purported to rely upon royalty rates for comparative technology in deriving his appraisal. However, he fails to do so in an appropriate or legally reliable fashion.

---

[1] *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).

[2] *ResQNet.com*, 594 F.3d at 871.

[3] Plaintiff's Response contends that a prototype of the '703 patent had been developed and that it was capable of being turned into a commercially-viable product once issues of speed were resolved, citing his own testimony and that of a TechGuard witness, David Maestus. However, plaintiff submits only an abbreviated portion of Maestas' testimony. Maestas actually testified that TechGuard never developed a functional, saleable product. (Maestas Dep. at 142:20 to 143:9) (full copy submitted as Exhibit A hereto in compliance with this Court's Order -- Doc. #9). The dispute, however, is immaterial to this motion because it is undisputed that the '703 patent has not been converted to a commercially-successful product whatever the reason, and Weeks does not base his opinion on market data for the '703 patent.

3

As the cases cited in Armstrong's principal memorandum show, plaintiff has the burden of showing that the licenses used for comparative purposes are "sufficiently comparable...." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009); *see also ResQNet.com*, 594 F.3d at 871-72. This requires more than a recitation of average royalty rates for an entire industry. It requires careful analysis of the licenses used for comparative purposes and a showing that they are "commensurate to the patent in suit." *ResQNet.com*, 594 F.3d at 871. Accordingly, an expert opining as to a royalty rate based on comparative licenses must explain the particular subject matter of those licenses so the fact finder can "adequately evaluate [their] probative value." *Lucent Techs.*, 580 F.3d at 1328. The expert's opinion "cannot stand solely on evidence which amounts to little more than a recitation of royalty numbers." *Id.* at 1329. Indeed, such a recitation requires no particular qualifications.

By plaintiff's own admission, Weeks did not perform the exacting analysis that the cases require. Rather, by merely looking at publications identifying royalty rates for "software" in general, he posited a 10% rate. (Response at 7-8). Weeks undertook no analysis whatsoever to determine that these software licenses were for comparable technologies as the cases require.[4]

Indeed, in his response, plaintiff did not even try to distinguish these cases Armstrong cited; he ignored them, referencing only the *Uniloc* case. Plaintiff correctly points out that *Uniloc* rejected the notion that a court could apply a 25% "rule of thumb" royalty rate. But the holding in *Uniloc* does not avail plaintiff. It hurts him. *Uniloc* required "a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue

---

[4] Put into a more common scenario, it is as if Weeks posits a home appraisal using a published national average home price, without considering the size of the home, the number of bedrooms, its location or its condition.

in the case." *Uniloc USA, Inc.*, 632 F.3d at 1317. In so stating, the *Uniloc* court specifically cited with approval the requirements set forth in both *ResQNet.com* and *Lucent Technologies* -- the two cases which plaintiff ignores in his response. Each of these cases -- *Uniloc*, *Lucent Technologies*, and *ResQNet.com* -- involved "software," and the licenses used for comparison also involved "software." Still, the courts ruled that was not enough, and it is not enough here.

The cases clearly require more exacting analysis than a resort to published data pertaining to the "software" industry in general. They require a showing that the licenses used for comparison purposes relate to similar types of software -- something which Weeks did not do. Accordingly, Weeks' valuation testimony should be excluded.

**B.   Weeks' Revenue Figures are a Product of Speculation and *Ipse Dixit* and are So Fundamentally Unsupported that his Resultant Valuation Must be Excluded.**

In addition to challenging Weeks' royalty rate based on his simplistic reliance on published data concerning average royalty rates for all software and his failure to drill down to the type of software at issue, Armstrong challenged Weeks' opinion based on the speculative nature of his revenue calculations. In his response, plaintiff provides no support for these figures except to say Weeks "has made appropriate assumptions under his methodology and appropriately made judgments of market penetration and utilization based on his experience." (Response at 9). Plaintiff adds:

> Weeks also has relied on published market reports of the market for firewalls and its past growth, and projected from there. He has analyzed competitive products and where the 703 technology fits the necessary market.

(Response at 9). But if he has done that, it is nowhere to be seen in his Report, which does nothing more than recite revenue figures and growth for the entire internet security market. He

5

does not analyze impediments to a new comer to the market; he does not consider competitive restrictions; and he does not evaluate consumer acceptance of a new product that would compete with the likes of Symantec, Norton, MacAfee and other widely-used and known internet security products. In fact, Weeks readily admitted that he posited a 10% market segment utilization and 10% market segment penetration rates "[j]ust from all of the reading that I did on the market itself, and then forming an opinion. ... I don't have any way of proving that that's true. It's an opinion, based on experience." (Weeks Dep. 110:14-19).

That is precisely the problem. Weeks' only support for his revenue calculations is speculation based on his purported experience. What that experience is or how it supports his conclusion that the '703 patent will obtain success in the marketplace is unstated. There is no way for anyone to verify these projections; they are just a number pulled from a hat. This is not a mere credibility issue. "Expert testimony that is speculative is not competent proof and contributes 'nothing to a legally sufficient evidentiary basis.'" *See Cole v. Homier Distrib. Co.*, 599 F.3d. 856, 867 (8th Cir. 2010) (quoting *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000)); *see also Tipton v. Mill Creek Gravel, Inc.*, 373 F.3d 913, 919 n.6 (8th Cir. 2004) ("[S]peculation as to probable or expected lost business profits is spurned, and proof of lost profits must be substantial.") (quoting *Anuhco, Inc. v. Westinghouse Credit Corp.*, 883 S.W.2d 910, 923 (Mo. App. 1994)).

An expert's qualifications "d[o] not give him free rein to speculate before the jury . . . by relying on inferences that have absolutely no record support." *Weisgram v. Marley Co.*, 169 F.3d 514, 519 (8th Cir. 1999). Because Weeks posits a valuation based on speculative assertions regarding the '703 patent's market viability, his opinions should be excluded.

### C. Weeks' Report is Insufficiently Tied to the Facts of this Case Because it Fails to Account for Plaintiff's Equity Interest in TechGuard and his Ex-Wife's 50% Interest in the '703 Patent.

An expert's opinion must be relevant, *i.e.*, it must sufficiently fit the facts of the case so as not to mislead or confuse the jury. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055-58 (8th Cir. 2000) (holding that expert opinion amounted to "mere speculation" and should not have been admitted because it did not incorporate all aspects of the economic reality of the relevant market and because it did not separate lawful conduct from unlawful conduct). Here, Weeks' opinion fails because it purports to provide a royalty value for the '703 patent as a whole, as if plaintiff received nothing else in return for it other than the purported royalties (Weeks' Dep. 133:14-17), and because it disregards Magee's 50% ownership and her right to license the patent in competition with plaintiff. Each of these circumstances means that even if Weeks had reliably appraised the '703 patent, Joyce's loss from Armstrong's alleged malpractice is not the $37 million Weeks identified. Because plaintiff received an equity interest which Weeks did not account for, and because Magee would also have rights to market the patent, it is worth less than $37 million to plaintiff.

Plaintiff's response belatedly acknowledges this failure, stating Weeks "did not assess Plaintiff's damages as such." (Response at 6). However, plaintiff adds that Weeks' valuation ought to be admitted because it "will aid a jury to determine the amount of damages." (*Id.*).

The acknowledgement that Weeks did not assess plaintiff's damages is inconsistent with the position plaintiff has consistently advanced in discovery where he posited Weeks' report as the computation of his damages. (*See* Plaintiff's Responses to Second Interrogatories of Defendant Armstrong Teasdale, LLP, No. 5 -- Doc 77-2; and Plaintiff's Initial Disclosures --

Doc. 77-3). Now, it appears that plaintiff is saying that Weeks' report is not a statement of his damages; only that it will assist the jury in determining his damages. However, how it will do this is unclear, given that Weeks has not quantified how plaintiff's equity interest in TechGuard and Magee's 50% interest in the '703 patent affects the value of the patent to plaintiff, and plaintiff has no other evidence to do this (or at least has not disclosed any such evidence). Thus, the jury would be left to speculate as to how this $37 million equates to plaintiff's damages. Indeed, the jury would likely be misled and confused and conclude that plaintiff's damages are $37 million (as plaintiff has contended until now).

By failing to evaluate the value plaintiff received by virtue of his equity interest in TechGuard and by failing to quantify how Magee's 50% interest in the patent would diminish the royalties plaintiff could obtain for it, Weeks' report is factually flawed. It fails to distinguish the loss plaintiff allegedly suffered from Armstrong's alleged wrongdoing from the loss he suffered by virtue of his divorce or for the difference between what he did receive (his equity interest in TechGuard) and what he would have received had he not licensed the '703 patent to TechGuard. As in *Cole v. Homier Distributing Co.*, 599 F.3d. at 865, Weeks' report offers no reliable assistance to the jury and fails to rise above the level of speculation as to what plaintiff's alleged damages are, and like there, such a speculative and unreliable damages estimate should be excluded. *Id; see also Concord Boat Corp.*, 207 F.3d at 1055-58 (holding that expert opinion should not have been admitted because it did not separate the losses flowing from lawful conduct from unlawful conduct).

## III. CONCLUSION

For the reasons stated in the motion to exclude the testimony of Stephen Weeks, in the memorandum of law in support and in this reply memorandum, this Court should enter its order excluding the testimony of Stephen Weeks and striking his report.

Respectfully submitted,

**LEWIS, RICE & FINGERSH, L.C.**

By: /s/ Joseph E. Martineau
   Andrew Rothschild, #23145MO
   arothschild@lewisrice.com
   Joseph E. Martineau, #32397MO
   jmartineau@lewisrice.com
   500 North Broadway, Suite 2000
   St. Louis, Missouri 63102
   Telephone: 314/444-7729
   Facsimile: 314/612-7729

ATTORNEYS FOR ARMSTRONG TEASDALE LLP

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served via the Court's electronic filing system, this 30th day of November, 2011, on:

Laurence D. Mass
230 South Bemiston Avenue
Suite 1200
St. Louis, Missouri 63105
laurencedmass@charter.net

/s/ Joseph E. Martineau