UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JAMES JOYCE, | ) |
| Plaintiff, | ) |
| vs. | ) No. 4:08-CV-1390 (CEJ) |
| ARMSTRONG TEASDALE, LLP, | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on defendant's motion to exclude the testimony of plaintiff's expert witness Stephen P. Weeks. Plaintiff opposes the motion and the issues have been fully briefed.

**I.  Background**

At issue in this case is whether defendant negligently advised plaintiff in executing a licensing agreement, resulting in a diminution of his rights IN U.S. Patent No. 6,519,703 ("'703"). Plaintiff intends to offer testimony from Weeks to show the value of the '703 patent.

Defendant provided representation to plaintiff and his then-wife in forming a company called TechGuard Security, LLC in 2000. Defendant also represented plaintiff in his application for the '703 patent. After filing the '703 application, plaintiff provided TechGuard with an exclusive royalty-free license for the lifetime of the '703 patent. This licensing agreement was also drafted by defendant.

Plaintiff's employment with TechGuard terminated in 2006. In 2007, plaintiff and his wife divorced. As part of the divorce settlement, plaintiff relinquished the majority of his ownership in TechGuard and 50% of his ownership in the '703 patent. Plaintiff still owns 50% of '703 patent, subject to TechGuard's license.

Plaintiff claims that, because he executed a power of attorney to defendant as required for the prosecution of the '703 patent, defendant owed him an independent duty of competent representation. He claims this duty was breached by the conflict of interest that existed where defendant represented both plaintiff and TechGuard in licensing the '703 patent. Plaintiff argues that, had this conflict not existed, the license to TechGuard would have included minimum royalty or anti-shelving provisions that would have preserved plaintiff's interest in the '703 patent in the event his employment with TechGuard was terminated. Plaintiff's damages theory is essentially that, even though TechGuard has not been successful in developing any product with the '703 patent, that plaintiff would have been able to license or develop products had the TechGuard license contained the provisions allegedly omitted through defendant's negligence.

II.   **Weeks' Expert Report and Deposition Testimony**

Defendant has submitted an expert report prepared by Weeks and the transcript of Weeks' deposition. (Doc. ## 74-1 and 74-2). Weeks' report describes the '703 patent as a process of identifying and preventing computer network security threats, generally known as a "firewall." (Doc. #74-1). The '703 technology uses a "heuristic" approach that plaintiff claims is able recognize and block new security threats that may not be detected by other existing security technologies. Id.

In his report dated June 26, 2009, Weeks assessed "the current value of the patent to be in the range of $37 million." Id. at p. 3. He based this value is based upon an income or "relief from royalty" approach—basically, the amount of licensing fees that could be generated by licensing the '703 patent to firms in the computer security industry. Weeks estimated that the '703 patent could be utilized in 10% of the products that make up the computer security market (segment utilization). (Doc. #74-1 at 14).

He based this figure on his opinion that the '703 technology remains competitive even though the "heuristic firewall market" is now "quite competitive, with major players slowly adopting heuristic principals." Id. Out of those products, Weeks then opines that competing technologies or non-adoption of the '703 technology will result in an estimated 10% actual use across the potential market segment (segment penetration). Id. This estimate is based on the conclusion that, if "aggressively pursued by any of several major licensees, it could penetrate as much as 10% of the available subsector to which it applies." Id. At his deposition, Weeks clarified that both the segment utilization and penetration rates were not calculated, but were opinions "based on his experience." (Doc. #74-2 at 110).

Weeks goes on to quantify the "risk" factor as 30%, reflecting moderate risk given that use of the '703 patent requires "making a new product using well-understood technology to a customer segment presently served by other products made by the licensing corporation and with evidence of demand for such new product." (Doc. #74-1 at 14). Weeks identifies a published source as the basis for this rate and classification. Weeks explained in his deposition that the "risk factor" is actually a discount rate that incorporates both the discount from future value to present value, as well as the increase in the risk of failure or displacement of the '703 technology as a function of time. (Doc. #74-2 at 141).

Weeks estimated that the commercialization of the '703 patent would begin near the end of 2010, with a five-year "ramp up" period in which 20% of the eventual market saturation occurs each year. Weeks assumes that this level of utilization will continue for the remaining life of the patent, which expires on April 14, 2020.

Next, the reasonable royalty rate derived by Weeks is 10%. He supports this figure with citations for sources estimating the average royalty rates in the software

industry. (Doc. #89-3). Weeks then applies these estimates to a computer security products market estimated to generate $13.5 billion in annual revenue in 2009, with annual growth of 9% in 2010-11 and 5% from 2012-2020.

Although plaintiff admits in an interrogatory answer that this figure must be reduced by 50% due to his ex-wife's ownership interest, Weeks' valuation does not take this into account. (Doc. #77-3). Nor does Weeks' report consider that plaintiff still owns 7% of TechGuard, which in turn holds the exclusive license to the '703 patent.

### III. Discussion

Federal Rule of Evidence 702 provides that a court may permit opinion testimony from an expert only if such testimony "will assist the trier of fact" and "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. The district courts act as gatekeepers, ensuring that expert testimony is "not only relevant, but reliable." Daubert v. Merrell Dow Pharmceuticals., Inc., 509 U.S. 579, 589 (1993). "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir.2001) (citing Daubert, 509 U.S. at 592). The district courts have "broad discretion" in determining whether an expert's testimony is admissible. Weisgram v. Marley Co., 169 F.3d 514, 518 (8th Cir.1999).

In Daubert, the Supreme Court outlined four factors that the district court may look to in evaluating the reliability of expert testimony: whether the theory or technique (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error; and (4) has gained general acceptance in the relevant community. Bland v. Verizon Wireless (VAW), LLC., 538 F.3d 896, 897 (8th

Cir.2008) (citing Daubert, 509 U.S. at 593-94). Daubert's progeny provide additional factors such as: "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." Lauzon v. Senco Products, Inc., 270 F.3d 681, 687 (8th Cir. 2001). "Regardless of what factors are evaluated, the main inquiry is whether the proffered expert's testimony is sufficiently reliable." First Union Nat. Bank v. Benham, 423 F.3d 855, 861 (8th Cir. 2005). "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Id. at 862. "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." Id.

The Court finds that Weeks' expert testimony is too reliant upon unsupported speculation to assist a trier of fact in determining what damages, if any, are attributable to defendant's alleged negligence. The "relief from royalty" or licensing income method of valuation employed by Weeks is an acceptable method for assessing the value of a patent. See, e.g., Hagelin, Ted, A New Method to Value Intellectual Property, 30 AIPLA Q.J. 353, 363 (2002). Weeks also has substantial experience and expertise in valuing intellectual property. (Doc. #89-1). The problem, however, is that the rates used by Weeks to estimate the commercial viability and reasonable royalty for the '703 are "so fundamentally unsupported that [they] offer no assistance to the jury." Cole v. Homier Distrib. Co., Inc., 599 F.3d 856, 865 (8th Cir. 2010) (internal citation omitted).

First, Weeks' report relies upon segment utilization and segment penetration rates to estimate the portion of the computer security market that would make up the royalty base for the '703 patent. Both of these rates are estimated to be 10%, resulting

in an net royalty base of 1% of the entire computer security market. These rates, however, are based solely upon generalizations about the computer security market, potential competing technologies, and commentary that other industry firms are working on similar technologies. Without any sort of quantitative analysis to demonstrate how these rates are reasonable in comparison to other related technologies, the basis for Weeks' testimony fails to rely on methodology that can be tested, rules out alternate possibilities, has an ascertainable rate of error, and is sufficiently connected to the facts of this case. See id. Stated another way, Weeks' methods for calculating a royalty base are too speculative to assist a jury in determining damages. Cole, 599 F.3d 856 at 867 ("in a spectrum ranging from speculation to exactitude, [expert's] report is too close to the former" to be admissible); see also IP Innovation L.L.C. v. Red Hat, Inc., 705 F. Supp. 2d 687, 688-89 (E.D. Tex. 2010) ("A reliable reasonable royalty calculation depends on trustworthy evidence of both the royalty base and the royalty rate.").[1]

Second, the reasonable royalty rate determined by Weeks was based solely several published sources that estimated the industry average for the entire computer software industry. In using a royalty rate that is derived from the average of a group of comparable licenses, a valuation expert must link certain licenses to the patent at issue. ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 871 (Fed. Cir. 2010). No such comparison was conducted by Weeks in his analysis. Similarly, in a recent decision the Federal Circuit held that general or theoretical royalty rates ran afoul of Daubert because such rates were not tailored to the facts of the case. Uniloc USA, Inc. v.

---

[1] The Court looks to Eighth Circuit precedent in resolving the evidentiary issues raised by defendant under Fed. R. Evid. 702. Smith v. Tenet Healthsystem SL, Inc., 436 F.3d 879, 885 (8th Cir. 2006). However, as plaintiff's alleged damages are related to the value of a patent, the decisions by the Federal Circuit in patent infringement cases are highly persuasive. See 28 U.S.C. § 1295(a)(1).

Microsoft Corp., 632 F.3d 1292, 1317 (Fed. Cir. 2011) (holding that use of the widely-accepted 25% "rule of thumb" rate inadmissible to calculate reasonable royalty rates).

Finally, it appears from Weeks' analysis that he used the "entire market value" of the products that might incorporate the '703 patent in his calculations despite his conclusion that the computer security market was moving toward more integrated products. This approach has also been discredited without a showing that "the patented feature creates the basis for customer demand or substantially create[s] the value of the component parts." Id. at 1318. (internal quotations omitted).  Again, no analysis as to what proportion of the royalty base value might be specifically attributable to the '703 technology was included in Weeks' report. In light of these infirmities, "sound economic and factual predicates are absent from a reasonable royalty analysis." IP Innovation L.L.C., 705 F. Supp. 2d at 689.

Because plaintiff has failed to demonstrate that the testimony of expert witness Stephen Weeks would be admissible under Fed. R. Civ. P. 702, exclusion is appropriate. In his response to the motion to exclude, plaintiff requests the opportunity to "repair" Weeks' testimony in the event it is excluded. [Doc. #98, p. 3]. See IP Innovation, 705 F.Supp.2d at 691 (after excluding plaintiff's expert witness, court agreed to "entertain appropriate motions to repair and prepare a record suitable for trial on the issue of damages."). Plaintiff has relied heavily on Weeks' report and testimony to support his claim for actual damages. The exclusion of this evidence may make it impossible for plaintiff to prove damages.[2] Also, it is noted that the ResQNet.com and Uniloc cases were decided after Weeks' report and deposition.

Given these circumstances, it may be appropriate to allow plaintiff to repair the

---

[2]Indeed, defendant has filed a motion for summary judgment, arguing that plaintiff cannot prove damages without evidence from an expert witness.

exclusion of his expert evidence.  However, if plaintiff wishes to repair, he must file a motion requesting permission to do so.  The defendant will be given the opportunity to respond.

Accordingly,

**IT IS HEREBY ORDERED** that the defendant's motion to exclude the expert testimony of Stephen P. Weeks [Doc. #74] is **granted**.

**IT IS FURTHER ORDERED** that plaintiff shall have until **August 25, 2012**, to file a motion to repair the exclusion of his expert evidence on the issue of damages. The defendant shall have until **September 4, 2012**, to file a response.  The plaintiff shall have until **September 9, 2012**, to file a reply.

The parties are discouraged from requesting any extension or modification of these deadlines other than for exceptional reasons (e.g., illness or death).

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 15th day of August, 2012.